MAYER, Circuit Judge,
concurring.
The Supreme Court in Alice Corporation v. CLS Bank International, 573 U.S. -, 134 S.Ct. 2347, 2359, 189 L.Ed.2d 296 (2014), for all intents and purposes, recited a “technological arts” test for patent eligibility. Because the claims asserted by I/P Engine, Inc. (“I/P Engine”) disclose no new technology, but instead simply recite the use of a generic computer to implement a well-known and widely-practiced technique for organizing information, they fall outside the ambit of 35 U.S.C. § 101. And if this determination had been made in the first instance as directed by the Supreme Court, unnecessary litigation, and nearly two weeks of trial and imposition on citizen jurors, could have been avoided.
I.
“[T]he patent system represents a carefully crafted bargain that encourages both the creation and the public disclosure of new and useful advances in technology, in return for an exclusive monopoly for a limited period of time.” Pfaff v. Wells Elecs., Inc., 525 U.S. 55, 63, 119 S.Ct. 304, 142 L.Ed.2d 261 (1998). A patentee does not uphold his end of this bargain if he seeks broad monopoly rights over a fundamental concept or basic idea without a concomitant contribution to the existing body of scientific and technological knowledge. Alice thus made clear that abstract ideas untethered to any significant advance in science and technology are ineligible for patent protection, concluding that a computer-implemented system for mitigating settlement risk fell outside section 101 because it did not “improve the functioning of the computer itself’ or “effect an improvement in any other technology or technical field.” 134 S.Ct. at 2359; see also id. at 2358 (explaining that the claims in Diamond v. Diehr, 450 U.S. 175, 177-79, *993 101 S.Ct. 1048, 67 L.Ed.2d 155 (1981) (“Diehr ”), were patent eligible because they disclosed an “improve[ment]” to a “technological process”).
Application of the technological arts test[1] for patent eligibility requires consideration of whether the claimed “inventive concept,” Mayo Collaborative Servs. v. Prometheus Labs., Inc., — U.S. -, 132 S.Ct. 1289, 1294, 182 L.Ed.2d 321 (2012), is an application of scientific principles or natural laws. See In re Bilski, 545 F.3d 943, 1010 (Fed.Cir.2008) (en banc) (Mayer, J., dissenting), aff'd on other grounds sub nom. Bilski v. Kappos, 561 U.S. 593, 130 S.Ct. 3218, 177 L.Ed.2d 792 (2010) (“[A] process is non-technological where its inventive concept is the application of principles drawn not from the natural sciences but from disciplines such as business, law, sociology, or psychology.”). Importantly, claims do not meet the demands of section 101 simply because they recite the use of computers or other technology. Instead, the inventive concept itself must be new technology, a novel application of scientific principles and natural laws to solve problems once thought intractable. See id. at 1002 (“Although business method applications may use technology — such as computers — to accomplish desired results, the innovative aspect of the claimed method is an entrepreneurial rather than a technological one”). The claims at issue in Alice may well have described a useful and innovative method of doing business,[2] but because they did not disclose any significant advance in science or technology, they fell outside section 101. See 134 S.Ct. at 2359 (noting that the claimed method simply “require[d] a generic computer to perform generic computer functions”).
Section 101 mandates not only that claims disclose an advance in science or technology — as opposed to an innovation in a non-technological discipline such as business, law, sports, sociology, or psychology — but also that this advance be both significant and well-defined. Id. at 2360 (“[T]he claims at issue amount to nothing significantly more than an instruction to apply the abstract idea of intermediated settlement using some unspecified, generic computer.” (citations and internal quotation marks omitted) (emphasis added)); see also Mayo, 132 S.Ct. at 1297 (“The question before us is whether the claims do significantly more than simply describe” a law of nature, (emphasis added)). Of course, if claims are drawn to the application of principles outside of the scientific realm — such as principles related to commercial or social interaction — no amount of specificity can save them from patent ineligibility. In Bilski, for example, a method *994 was rejected under section 101 notwithstanding the fact that it described a very specific method of using historical weather-related data to hedge against price increases. 130 S.Ct. at 3223-24; see Parker v. Flook, 437 U.S. 584, 593, 98 S.Ct. 2522, 57 L.Ed.2d 451 (1978) (“Flook ”) (rejecting the argument “that if a process application implements a principle in some specific fashion, it automatically falls within the patentable subject matter of § 101”). Meaningful, well-defined limits on the application of a principle or idea are thus a necessary, but not a sufficient, prerequisite for patent eligibility. Requiring carefully circumscribed bounds on the application of scientific principles and natural laws serves to ensure that “the basic tools of scientific and technological work,” Gottschalk v. Benson, 409 U.S. 63, 67, 93 S.Ct. 253, 34 L.Ed.2d 273, (1972), remain “free to all men and reserved exclusively to none,” Funk Bros. Seed Co. v. Kalo Inoculant Co., 333 U.S. 127, 130, 68 S.Ct. 440, 92 L.Ed. 588 (1948); see Mayo, 132 S.Ct. at 1293.[3]
In the more difficult cases — where it is uncertain whether claims are sufficiently “technological” to warrant patent protection — subject matter eligibility will often turn on whether the claims describe a narrow inventive application of a scientific principle, or instead simply recite steps that are necessarily part of the principle itself. See Mayo, 132 S.Ct. at 1297 (explaining that a process reciting a law of nature is not patent eligible unless it “has additional features that provide practical assurance that the process is more than a drafting effort designed to monopolize the law of nature itself’). In Mayo, for example, claims were rejected, in part, because they were “overly broad,” id. at 1301, and did “not confine their reach to particular applications,” id. at 1302. The need for specificity sufficient to cabin the scope of an invention is particularly acute in the software arena, where claims tend to be exceedingly broad, development proceeds at breakneck speed, and innovation often occurs despite the availability of patent protection rather than because of it.
Finally, and most importantly, the technological arts test recognizes that there has to be some rough correlation between “the give and the get” — applicants who make little, if any, substantive contribution to the existing body of scientific and technological knowledge should not be afforded broad monopoly rights that potentially stifle future research and development. In assessing patent eligibility, “the underlying functional concern ... is a relative one: how much future innovation is foreclosed relative to the contribution of the inventor.” Mayo, 132 S.Ct. at 1303. At its core, section 101 prohibits claims which are “overly broad,” id. at 1301, in proportion to the technological dividends they yield.
II.
I/P Engine’s claimed invention, which describes a system which filters information for relevance to a user’s query using combined content and collaborative data, see U.S. Patent No. 6,314,420 col.2811.1-15; U.S. Patent No. 6,775,664 col.27 11.27-37, does not pass muster under section 101. *995 The asserted claims do not meet subject matter eligibility requirements because they do not “improve the functioning of the computer itself’ or “effect an improvement in any other technology or technical field.” Alice, 134 S.Ct. at 2359. To the contrary, the use of search engines was well-established and the clear advantages of combining content-based and collaborative filtering were widely recognized at the time of the claimed invention. See ante at 986-87.
The asserted claims simply describe the well-known and widely-applied concept that it is often helpful to have both content-based and collaborative information about a specific area of interest.[4] A person planning to visit London, for example, might consult a guidebook that would provide information about particular museums in London (content data) as well as information about what other people thought of these museums (collaborative data). See J.A. 4255-56.
I/P Engine’s claimed system is merely an Internet iteration of the basic concept of combining content and collaborative data, relying for implementation on “a generic computer to perform generic computer functions.” Alice, 134 S.Ct. at 2359; see also id. (explaining that using a computer to obtain data is “well-understood” and “routine” (citations and internal quotation marks omitted)); CyberSource Corp. v. Retail Decisions, Inc., 654. F.3d 1366, 1370 (Fed.Cir.2011) (concluding that a claim which disclosed the “mere collection and organization of data regarding credit card numbers and Internet addresses” was patent ineligible).
Moreover, the scope of the claimed invention is staggering, potentially covering a significant portion of all online advertising. I/P Engine’s asserted claims fall outside section 101 because their broad and sweeping reach is vastly disproportionate to their minimal technological disclosure.
III.
The Supreme Court has dictated that the subject matter eligibility analysis must precede the obviousness inquiry. Flook, 437 U.S. at 593, 98 S.Ct. 2522 (“The obligation to determine what type of discovery is sought to be patented” so as to determine whether it falls within the ambit of section 101 “must precede the determination of whether that discovery is, in fact, new or obvious.”); Bilski, 130 S.Ct. at 3225 (explaining that the issue of whether claims are directed to statutory subject matter is “a threshold test”); see also In re Comiskey, 554 F.3d 967, 973 (Fed.Cir.2009) (“Only if the requirements of § 101 are satisfied is the inventor allowed to pass through to the other requirements for pat-entability, such as novelty under § 102 and ... non-obviousness under § 103.” (citations and internal quotation marks omitted)). To fail to address at the very outset whether claims meet the strictures of section 101 is to put the cart before the horse. Until it is determined that claimed subject matter is even eligible for patent protection, a court has no warrant to consider subordinate validity issues such as non-obviousness under 35 U.S.C. § 103 or ade *996 quate written description under 35 U.S.C. § 112.
From a practical perspective, there are clear advantages to addressing section 101’s requirements at the outset of litigation. Patent eligibility issues can often be resolved without lengthy claim construction, and an early determination that the subject matter of asserted claims is patent ineligible can spare both litigants and courts years of needless litigation. To the extent that certain classes of claims — such as claims on methods of doing business— are deemed presumptively patent ineligible, moreover, the United States Patent and Trademark Office will have more resources to devote to expeditiously processing applications which disclose truly important advances in science and technology.
Even more fundamentally, the power to issue patents is not unbounded. To the contrary, the constitutional grant of authority “[t]o promote the Progress of Science and useful Arts, by securing for limited Times to Authors and Inventors the exclusive Right to their respective Writings and Discoveries,” U.S. Const, art. I, § 8, cl. 8, “is both a grant of power and a limitation,” Graham v. John Deere Co., 383 U.S. 1, 5, 86 S.Ct. 684, 15 L.Ed.2d 545 (1966); see Bonito Boats, Inc. v. Thunder Craft Boats, Inc., 489 U.S. 141, 146, 109 S.Ct. 971, 103 L.Ed.2d 118 (1989). Section 101’s vital role — a role that sections 103 and 112 “are not equipped” to take on, Mayo, 132 S.Ct. at 1304 — is to insure that patent protection promotes, rather than impedes, scientific progress and technological innovation. A robust application of section 101 ensures that the nation’s patent laws remain tethered to their constitutional moorings.

. One of our predecessor courts likewise applied a technological arts test for patent eligibility. It recognized that patentable processes must ‘‘be in the technological arts so as to be in consonance with the Constitutional purpose to promote the progress of 'useful arts.’ ” In re Musgrave, 431 F.2d 882, 893 (CCPA 1970) (quoting U.S. Const, art. I, § 8, cl. 8).

. In Alice, the Supreme Court concluded that the concept of intermediated settlement was a patent-ineligible abstract idea. 134 S.Ct. at 2355-57. But whether the "concept” of in-termediated settlement is an abstract idea is a wholly different question from whether the claimed invention provided a useful and innovative application of that concept. Significantly, in determining whether the asserted claims disclosed an inventive concept sufficient to make the claimed abstract idea patent eligible, the Court looked solely at the technology — asking only whether the recited computer elements were “well-understood, routine, [and] conventional.” Id. at 2359 (citations and internal quotation marks omitted). The issue of whether the claimed in-termediated settlement technique represented an innovative method for improving commercial transactions was not addressed because advances in non-technological disciplines, such as business, are irrelevant for purposes of the section 101 inquiry.

. There is, of course, some "overlap” between the eligibility analysis under section 101 and the obviousness inquiry under 35 U.S.C. § 103. Mayo, 132 S.Ct. at 1304. Section 103, however, asks the narrow question of whether particular claims are obvious in view of the prior art. By contrast, the section 101 inquiry is broader and more essential: it asks whether the claimed subject matter, stripped of any conventional elements, is "the kind of 'discover[y]’ " that the patent laws were intended to protect. Flook, 437 U.S. at 593, 98 S.Ct. 2522.

. In its appeal brief, I/P Engine notes that the shared specification of the asserted patents describes "a variety of ways in which content and collaborative feedback data can be combined,” including through the use of a “complex neural network function.” Br. of Plaintiff-Cross Appellant at 10. As we recently made clear, however, "the important inquiry for a § 101 analysis is to look to the claim[s].” Accenture Global Servs., GmbH v. Guidewire Software, Inc., 728 F.3d 1336, 1345 (Fed.Cir.2013). Accordingly, “the complexity of the implementing software or the level of detail in the specification does not transform a claim reciting only an abstract concept into a patent-eligible system or method." Id.