Prost, Chief Judge, dissenting.
I would find the asserted patent claims to be directed to a law of nature. The majority finds the claims herein are not directed to a natural law at step one of the § 101 analysis, but its efforts to distinguish Mayo cannot withstand scrutiny. The majority relies on the claims' recitation of specific applications of the discovery underpinning the patent to find no natural law is claimed. But it conflates the inquiry at step one with the search for an inventive concept at step two. Once the natural law claimed in the '610 patent is understood in a manner consistent with Mayo , what remains fails to supply the requisite inventive concept to transform the natural law into patent-eligible subject matter. Although I agree with the majority's reasoning that the district court had jurisdiction under the Hatch-Waxman Act, I would not reach the issues of written description, infringement, and injunctive relief because I would find the '610 patent claims ineligible subject matter. Accordingly, I respectfully dissent.
In order "to transform an unpatentable law of nature into a patent-eligible application of such a law, a patent must do more than simply state the law of nature while adding the words 'apply it.' " Mayo Collaborative Servs. v. Prometheus Labs., Inc. , 566 U.S. 66, 72, 132 S.Ct. 1289, 182 L.Ed.2d 321 (2012). While the claims here do not solely state a law of nature, they do no more than simply direct the relevant audience to apply it.
The '610 patent itself identifies its invention as "compris[ing] the discovery that treatment of a patient, who has lower CYP2D6 activity than a normal person, with a drug that is pre-disposed to cause QT prolongation and is metabolized by the CYP2D6 enzyme, can be accomplish[ed] more safely by administering a lower dose of the drug than would be administered to a person who has normal CYP2D6 enzyme activity." '610 patent col. 2 ll. 15-21. Nevertheless, the majority concludes that the claims here are not directed to ineligible subject matter at step one of the Mayo / Alice inquiry. Majority Op. at 28. I disagree.
The representative claim in Mayo , i.e., Claim 1, recited:
A method of optimizing therapeutic efficacy for treatment of an immune-mediated gastrointestinal disorder, comprising:
(a) administering a drug providing 6-thioguanine to a subject having said immune-mediated gastrointestinal disorder ; and
(b) determining the level of 6-thioguanine in said subject having said immune-mediated gastrointestinal disorder,
wherein the level of 6-thioguanine less than about 230 pmol per 8x10[8] red blood cells indicates a need to increase the amount of said drug subsequently administered to said subject and
wherein the level of 6-thioguanine greater than about 400 pmol per 8x10[8] red blood cells indicates a need to decrease *1141 the amount of said drug subsequently administered to said subject.
Mayo , 566 U.S. at 74-75, 132 S.Ct. 1289 (quoting U.S. Patent No. 6,355,623 col. 20 ll. 10-20).
The Court stated that the patent in Mayo "set forth laws of nature-namely, relationships between concentrations of certain metabolites in the blood and the likelihood that a dosage of a thiopurine drug will prove ineffective or cause harm." Id. at 77, 132 S.Ct. 1289. As one example of the laws of nature set forth in the patent, the Court pointed to Claim 1's statement "that if the levels of 6-TG in the blood (of a patient who has taken a dose of a thiopurine drug) exceed about 400 pmol per 8x10[8] red blood cells, then the administered dose is likely to produce toxic side effects." Id . Thus, the law of nature identified by the Supreme Court in Mayo encompassed not only the bare fact of the relationship between thiopurine metabolite concentrations and efficacy or side effects of a thiopurine drug, but also the precise levels of concentration in question. See id. at 74, 132 S.Ct. 1289 ("But those in the field did not know the precise correlations between metabolite levels and likely harm or ineffectiveness. The patent claims at issue here set forth processes embodying researchers' findings that identified these correlations with some precision.").
In the present case, Claim 1 of the '610 patent reads as follows:
A method for treating a patient with iloperidone, wherein the patient is suffering from schizophrenia, the method comprising the steps of:
determining whether the patient is a CYP2D6 poor metabolizer by:
obtaining or having obtained a biological sample from the patient;
and
performing or having performed a genotyping assay on the biological sample to determine if the patient has a CYP2D6 poor metabolizer genotype; and
if the patient has a CYP2D6 poor metabolizer genotype, then internally administering iloperidone to the patient in an amount of 12 mg/day or less, and
if the patient does not have a CYP2D6 poor metabolizer genotype, then internally administering iloperidone to the patient in an amount that is greater than 12 mg/day, up to 24 mg/day,
wherein a risk of QTc prolongation for a patient having a CYP2D6 poor metabolizer genotype is lower following the internal administration of 12 mg/day or less than it would be if the iloperidone were administered in an amount of greater than 12 mg/day, up to 24 mg/day.
'610 patent col. 17 ll. 2-25.
This claim, which is representative of the '610 patent, also sets forth a natural relationship-namely, the relationship between the CYP2D6 genotype and the likelihood that a dosage of iloperidone will cause QTc prolongation. The majority notes that the claims in Mayo were directed to the relationships that comprised the natural law, and not "to a novel method of treating a disease." Majority Op. at 29. Here, according to the majority, while the inventors recognized a natural law, "that is not what they claimed." Id. at 30. Rather, the claims of the '610 patent require a treating doctor to administer iloperidone in "specific dosages" based on the results of a genotyping assay. Id. But reciting specific metes and bounds in the claims did not prevent the Supreme Court from concluding those claims set forth a natural law in Mayo . We are not free to depart from the Supreme Court's holding.
*1142 As the majority notes, the '610 patent claims a method of treating schizophrenia with iloperidone "that is safer for patients because it reduces the risk of QTc prolongation." Majority Op. at 30. This is no more than an optimization of an existing treatment of schizophrenia, just as the claims in Mayo concerned "optimizing therapeutic efficacy" of thiopurine drugs. Mayo warned against "drafting effort[s] designed to monopolize the law of nature itself." 566 U.S. at 77, 132 S.Ct. 1289. The majority does not heed that warning.
The Court in Mayo found that the claim limitation concerning "administering" a thiopurine drug to a patient "simply refer[red] to the relevant audience, namely doctors who treat patients with certain diseases with thiopurine drugs"-an audience that existed long before the patent disclosure. Id. at 78, 132 S.Ct. 1289. So too here. The audience of physicians treating schizophrenia with iloperidone long predated the '610 patent. The patent simply discloses the natural law that a known side effect of the existing treatment could be reduced by administering a lower dose to CYP2D6 poor-metabolizers. It claims no more than instructions directing that audience to apply the natural law in a routine and conventional manner.
The majority fails to reconcile this substantive similarity between our case and Mayo . Instead, it points to the specific dosages as a distinction between the administering step here and that in Mayo . But Mayo examined the significance of the "administering" step in its search for an inventive concept, not as part of the determination whether the claims were directed to a natural law at the threshold. And the specific dosage adds nothing inventive to the claims beyond the natural law.
Nor does the other element of specificity identified by the majority rescue the claims. The claims here specify a means of identifying a patient's genotype (a "genetic assay"), while the claims in Mayo left open the means of measuring the relevant metabolite. But the genetic assay is purely conventional pre-solution activity that cannot be used to circumvent eligibility under § 101. See Mayo , 566 U.S. at 79, 132 S.Ct. 1289.
The majority notes the claims here require treatment with iloperidone within the dosage range indicated, while the claims in Mayo could be infringed by treatment with thiopurine "whether that treatment does, or does not, change in light of the inference " indicated by the natural law. Mayo , 566 U.S. at 86, 132 S.Ct. 1289 (emphasis added); see Majority Op. at 30-31. But that inquiry in Mayo also came as part of the search for an inventive concept, and requiring a dosage instead of indicating a dosage is not sufficient at step two. The difference is of no moment.
The majority points to the Supreme Court's statement in Mayo that "[u]nlike, say, a typical patent on a new drug or a new way of using an existing drug, the patent claims do not confine their reach to particular applications of those laws." Majority Op. at 29-30 (quoting Mayo , 566 U.S. at 87, 132 S.Ct. 1289 ). It similarly points to our decision in Rapid Litigation Management Ltd. v. CellzDirect, Inc. , wherein we indicated that "the natural ability of the subject matter to undergo the process does not make the claim 'directed to' that natural ability," lest we find ineligible methods of "treating cancer with chemotherapy (as directed to cancer cells' inability to survive chemotherapy), or treating headaches with aspirin (as directed to the human body's natural response to aspirin )." 827 F.3d 1042, 1049 (Fed. Cir. 2016). But that is not this case.
Whatever weight can be ascribed to the foregoing statements about methods of *1143 treatment, we remain beholden to the holding of Mayo , which, in my view, requires us to find the claims directed to a natural law at step one. (And I find no inventive concept in the claims once the natural law at issue is properly understood in view of Mayo .)[1]
My conclusion is not at odds with CellzDirect . There, the alleged law of nature was the capability of hepatocyte cells to survive multiple freeze-thaw cycles. Because the "end result" of the claims therein was "not simply an observation or detection of the ability of hepatocytes to survive multiple freeze-thaw cycles" but rather "a new and useful method of preserving hepatocyte cells," we held the claims were not directed to a law of nature. Id. at 1049.
Here, the end result of the claimed process is no more than the conclusion of a natural law. The fact that a reduction of iloperidone dosage in poor metabolizers to the may reduce QTc prolongation is both the means and the ends of this claim. The recitation of the specific dosages adds no more than a conventional application of that natural law. I see no distinction from Mayo , so I would hold the asserted claims directed to ineligible subject matter and lacking an inventive concept sufficient to transform it into patent-eligible subject matter. I respectfully dissent.

Indeed, the unpredictable results of clinical testing regarding the relationship among CYP2D6, iloperidone, and QTc prolongation formed the basis of the district court's finding of non-obviousness. See J.A. 13-15. In particular, the district court pointed to West-Ward's evidence that "it was unpredictable whether any dosage adjustment would be needed for CYP2D6 poor metabolizers, much less the amount of adjustment needed to achieve the pharmacokinetic profile seen in normal metabolizers." J.A. 14. That is, the district court found non-obviousness based on the revelation of the natural law underpinning the claims, not in any other aspect of the claims.