DYK, Circuit Judge,
concurring in the denial of the petition for rehearing en banc.
I concur in the court’s denial of rehearing en banc. In my view the framework of Mayo and Alice is an essential ingredient of a healthy patent system, allowing the invalidation of improperly issued and highly anticompetitive patents without the need for protracted and expensive litigation. Yet I share the concerns of some of my colleagues that a too restrictive test for patent eligibility under 35 U.S.C. § 101 with respect to laws of nature (reflected in some of the language in Mayo) may discourage development and disclosure of new diagnostic and therapeutic methods in the life sciences, which are often driven by discovery of new natural laws and phenomena. This leads me to think that some further illumination as to the scope of Mayo would be beneficial in one limited aspect. At the same time I think that we are bound by the language of Mayo, and' any further guidance must come from the Supreme Court, not this court.
I
The language of Mayo is clear. The Mayo Court found that prior Supreme Court decisions “insist that a process that focuses upon the use of a natural law also contain other elements or a combination of elements, sometimes referred to as an ‘inventive concept,’ sufficient to ensure that the patent in practice amounts to significantly more than a patent upon the natural law itself.” Mayo Collaborative Servs. v. Prometheus Labs., Inc., — U.S. -, 132 S.Ct. 1289, 1294, 182 L.Ed.2d 321 (2012) (quoting Parker v. Flook, 437 U.S. 584, 594, 98 S.Ct. 2522, 57 L.Ed.2d 451. (1978)). Patent claims directed to laws of nature are ineligible under 35 U.S.C. § 101 when, “(apart from the natural laws themselves) [they] involve- well-understood, routine, conventional activity previously engaged in by researchers in the field.” Id. (emphasis added). Reviewing the - Court’s earlier Flook decision, the Mayo Court determined that Flook’s claim to a chemical process applying an “apparently novel mathematical algorithm,” id. at 1298, was ineligible under § 101 because the steps of the process “were all “well known,’ to the point where, putting the formula to the side, there was no ‘inventive concept’ in the claimed application of the formula,” id. at 1299 (quoting Flook, 437 U.S. at 594, 98 S.Ct. 2522) (emphasis added). “[S]imply appending conventional steps, specified at a high level of generality, to laws of nature, natural phenomena, and abstract ideas cannot make those laws, phenomena, and ideas patentable.” Id. at 1300. In other words, Mayo states that the inventive concept necessary for eligibility must come in the application analyzed at step two, rather than from the discovery of the law of nature itself.
*1288 Alice subsequently confirmed that the two-step framework articulated in Mayo is a unitary rule that applies equally “for distinguishing patents that claim laws of nature, natural phenomena, and abstract ideas from those that claim patent-eligible applications of those concepts.” Alice Corp. Pty. Ltd. v. CLS Bank Int’l, — U.S. -, 134 S.Ct. 2347, 2355, 189 L.Ed.2d 296 (2014) (citing Mayo). Alice explained,
First, we determine whether the claims at issue are directed to one of those patent-ineligible concepts.- If so, we then ask, what else is there in the claims before us? ... We have described step two of this analysis as a search for an inventive concept — i.e., an element or combination of elements that is sufficient to ensure that the patent in practice amounts to significantly more than a patent upon the ineligible concept itself.
Id. (emphasis added) (alterations, citations, and quotation marks omitted). “At Mayo step two, we must examine the elements of the claim to determine whether it contains an ‘inventive concept’ sufficient to ‘transform’ the claimed abstract idea into a patent-eligible application.” Id. at 2357 (emphasis added) (quotation marks omitted). Thus Alice also holds that inventive concept must be found at step two of the framework.
Mayo has unambiguously announced a generally applicable test for determining subject-matter eligibility under § 101 with respect to laws of nature, and we are bound to follow it. We cannot confine Mayo to its facts or otherwise cabin a clear statement from the Supreme Court. “[0]nce the Court has spoken, it is the duty of other courts to respect that understanding of the governing rule of law.” Rivers v. Roadway Express, Inc., 511 U.S. 298, 312, 114 S.Ct. 1510, 128 L.Ed.2d 274 (1994). A court of appeals must not “con-fus[e] the factual contours of [a Supreme Court decision] for its unmistakable holding” to arrive at a “novel interpretation” of that decision. Thurston Motor Lines, Inc. v. Jordan K. Rand, Ltd., 460 U.S. 533, 534-35, 103 S.Ct. 1343, 75 L.Ed.2d 260 (1983) (per curiam). As we have recognized, “[a]s a subordinate federal court, we may not so easily dismiss [the Supreme Court’s] statements as dicta but are bound to follow them.” Ariad Pharm., Inc. v. Eli Lilly & Co., 598 F.3d 1336, 1347 (Fed.Cir.2010) (en banc). (citing Stone Container Corp. v. United States, 229 F.3d 1345, 1349-50 (Fed.Cir.2000)).
The panel thus held correctly that Mayo is controlling precedent that governs the outcome here. The panel’s opinion aptly states and applies the two-step framework of Mayo. “First, we determine whether the claims at issue are directed to a patent-ineligible concept.” Ariosa Diagnostics, Inc. v. Sequenom, Inc., 788 F.3d 1371, 1375 (Fed.Cir.2015) (citing Mayo, 566 U.S. at -, 132 S.Ct. at 1292). “[T]he claims at issue, as informed by the specification, are generally directed to detecting the presence of a naturally occurring thing or a natural phenomenon, cffDNA in maternal plasma or serum.... [T]he claimed method begins and ends .with a naturally occurring phenomenon.” Id. at 1376. At the second step of the Mayo framework, the panel determined that “[t]he method at issue here amounts to a general instruction to doctors to apply routine, conventional techniques when seeking to detect cffDNA.” Id. at 1377. The panel therefore found that the claims were not patent eligible under § 101. Id. at 1378.
II
The Mayo/Alice framework works well when the abstract idea or law of nature in question is well known and longstanding, as was the situation in Mayo itself (as discussed below), earlier Supreme Court *1289 cases,[1] and in many of our own recent cases where we have found claims patent ineligible under § 101.[2] Where the abstract idea or law of nature is well known and longstanding, there is no basis for attributing novelty to that aspect of the claimed invention.
Also, it seems to me that the Mayo/Alice framework works well with respect to abstract ideas. In my view, claims to business methods and other processes that merely organize human activity should not be patent eligible under any circumstances. See Alice, 134 S.Ct. at 2360 (Sotomayor, J., concurring); In re Bilski, 545 F.3d 943, 972 (Fed.Cir.2008) (en banc) (Dyk, J., concurring). In any event, departing from the Mayo/Alice framework with respect to abstract ideas (as opposed to discoveries of natural laws and phenomena) would create serious risks of undue preemption because of the difficulty in distinguishing between new and established abstract ideas.
But, as I see it, there is a problem with Mayo insofar as it concludes that inventive concept cannot come from discovering something new in nature — e.g., identification of a previously unknown natural relationship or property. In my view, Mayo did not fully take into account the fact that an inventive concept can come not just from creative, unconventional application of a natural law, but also from the creativity and novelty of the discovery of the law itself. This is especially true in the life sciences, where development of useful new diagnostic and therapeutic methods is driven by investigation of complex biological systems. I worry that method claims that apply newly discovered natural laws and phenomena in somewhat conventional ways are screened out by the Mayo test. In this regard I think that Mayo may not *1290 be entirely consistent with the Supreme Court’s decision in Myriad.[3]
In Myriad the patent applicant discovered a previously unknown natural phenomenon: the sequences of the BRCA1 and BRCA2 genes and their connection with cancer. Ass’n for Molecular Pathology v. Myriad Genetics, Inc., — U.S. -, 133 S.Ct. 2107, 2112-13, 186 L.Ed.2d 124 (2013). While the Court found ineligible Myriad’s claims to naturally occurring gDNA sequences, it suggested that “new applications of knowledge about the BRCA1 and BRCA2 genes” could generally be eligible, with reference to claim 21 of U.S. Patent No. 5,753,441 (discussed further below).[4] Id. at 2120. Myriad thus appeared to recognize that an inventive concept can sometimes come from discovery of an unknown natural phenomenon, not just from unconventional application of a phenomenon. As Myriad emphasized, the first party with knowledge of a law of nature, natural phenomenon, or abstract idea should be “in an excellent position to claim applications of that knowledge.” Id. (quoting Ass’n for Molecular Pathology v. USPTO, 689 F.3d 1303, 1349 (Fed.Cir.2012) (Bryson, J., concurring in part and dissenting in part)).
Ill
Of course, I do not suggest that a newly discovered law of nature should be patent eligible in its entirety. Laws of nature are never patentable as such, even when first discovered by the patent applicant. As Mayo recognized, “Einstein could not patent his celebrated law that E=mc2.” 132 S.Ct. at 1293 (quoting Diamond v. Chakrabarty, 447 U.S. 303, 309, 100 S.Ct. 2204, 65 L.Ed.2d 144 (1980)); see also Flook, 437 U.S. at 591, 98 S.Ct. 2522; Gottschalk v. Benson, 409 U.S. 63, 72, 93 S.Ct. 253, 34 L.Ed.2d 273 (1972) (holding that claims to methods of using a new mathematical algorithm were unpatentable because they “in practical effect would be a patent on the algorithm itself’). Myriad itself reminded us that “[gjroundbreaking, innovative, or even brilliant discovery does not by itself satisfy the § 101 inquiry.” Myriad, 133 S.Ct. at 2117; see also Ariosa, 788 F.3d at 1379.
The primary concern with a patent on a law of nature is undue preemption — the fear that others’ innovative future applications of the law will be foreclosed. See O’Reilly v. Morse, 56 U.S. 62, 113, 15 How. 62, 14 L.Ed. 601 (1853); Mayo, 132 S.Ct. at 1301. As Mayo emphasized, “there is a danger that the grant of patents that tie up the[ ] use [of laws of nature] will inhibit future innovation premised upon them....” 132 S.Ct. at 1301; see also id. at 1304 (highlighting “the kind of risk that underlies the law of nature exception, namely the risk that a patent on the law would significantly impede future innovation”).
As far back as O’Reilly v. Morse, the Supreme Court found unpatentable Morse’s sweeping claim to all “marking or printing [of] intelligible characters, signs, or letters, at any distances” via “the use of the motive power of the electric or galvanic current, which I call electromagnetism,” *1291 holding that ‘‘the claim is too broad, and not warranted by law.” 56 U.S. at 112, 113. Morse, like Mayo, was concerned with undue preemption of the building blocks of human ingenuity. “[W]hile he shuts the door against inventions of other persons, the patentee would be able to avail himself of new discoveries in the properties and powers of electro-magne-tism which scientific men might bring to light.” Id. at 113.
Similarly, in an aspect of our original Myriad decision that was not-reversed by the Supreme Court, Ass’n for Molecular Pathology v. Myriad Genetics, Inc., — U.S. -, 133 S.Ct. 694, 184 L.Ed.2d 496 (2012), and again in our court’s recent In re BRCAl- & BRCAZ-Based Hereditary Cancer Test decision, we found genetic testing claims that sought to capture “all comparisons between the patient’s BRCA genes and the wild-type BRCA genes” to be overbroad and thus ineligible under § 101, noting that “[t]he covered comparisons are not restricted by the purpose of the comparison or the alteration being detected.” 774 F.3d 755, 763, 765 (Fed.Cir.2014).
However, if the breadth of the claim is sufficiently limited to a specific application of the new law of nature discovered by the patent applicant and reduced to practice, I think that the novelty of the discovery should be enough to supply the necessary inventive concept. My proposed approach would require that the claimed application be both narrow in scope and actually reduced to practice, not merely .“constructively” reduced to practice by filing of a patent application replete with prophetic examples.
In my view, the breadth of the claim should be critical. Even when a patent applicant has demonstrated some particular utility for a newly discovered law of nature and reduced it to practice, the claim should be. invalid unless narrowly tailored to the particular application of the law that has been developed. Claims that extend far beyond the utility demonstrated by the patent applicant and reduced to practice should be invalid, as they “too broadly preempt the use” of the underlying idea by others. Mayo, 132 S.Ct. at 1294; see also Diamond v. Diehr, 450 U.S. 175, 191-92, 101 S.Ct. .1048, 67 L.Ed.2d 155 (1981). But, so long-as a claim is narrowly tailored to what the patent applicant has actually invented and reduced to practice, there is limited risk of undue preemption of the underlying idea. In Myriad the Court noted, 133 S.Ct. at 2120, that an example of a meritorious claim might be claim 21 of Myriad’s U.S. Patent, No. 5,753,441 (“the '441 patent”), which was not at issue in the case and which Judge Bryson discussed in his concurring opinion on our court’s decision below, Ass’n for Molecular Pathology, 689 F.3d at 1348 (Bryson, J., concurring). Claim 21 of the '441 patent covers a method of detecting any .of several specific mutations in the BRCAl gene, newly discovered by the patent applicant and shown to increase a person’s risk of developing particular . cancers, using conventional methods. See In re BRCA1 & BRCA2, 774 F.3d at, 765.
This approach appears also to be supported by Morse. The Supreme Court established in Morse that the extent to which a patentee can claim is the extent to which he has actually made some concrete use of the discovery and reduced it to practice. “The specification of this paten-tee describes his invention or discovery, and the manner and process of constructing and using it; and his patent ... covers nothing more.” Morse, 56 U.S. at 119. Limiting patentees to narrow applications they have actually developed and reduced to practice would be in keeping with Mayo’s commandment that “simply ap *1292 pending conventional steps, specified at a high level of generality, to laws of nature, natural phenomena, and abstract ideas cannot make those laws, phenomena, and ideas patentable.” Mayo, 132 S.Ct. at 1300 (emphasis added).
This proposed approach, limiting- the scope of patents based on new discoveries to narrow claims covering applications actually reduced to practice, would allow the inventor to enjoy an exclusive right to what he himself has invented and put into practice, but not to prevent new applications of the natural law by others.[5] This would ensure that the scope of the patent claims would not “foreclose[ ] more future invention than the underlying discovery could reasonably justify.” Id. at 1301. Limiting the scope of the patent also would avoid -the problem that “the more abstractly [a process patent’s] claims are stated, the more difficult it is to determine precisely what they cover.” Mayo, 132 S.Ct. at 1302 (quoting Christina Bohannan & Herbert Hovenkamp, Creation without Restraint: Promoting Liberty and Rivalry in Innovation 112 (2012)).
To be sure, determination of whether a claim applying a new law of nature is overbroad could present difficulties of definition and line drawing. But allowing narrow claims that have been actually reduced to practice when those claims embody an inventive, newly discovered law of nature would promote the fundamental policies underlying § 101. Requiring narrow claims and actual reduction to practice would be a reasonable accommodation in return for a more permissive inventive concept requirement. The approach would, I think, ensure that only diagnostic and therapeutic method patents limited in their claim scope would survive. These patents would provide the world with disclosure and useful applications of previously unknown natural laws, and the opportunity to obtain such patents would help to restore the incentive to make those discoveries that the patent system has historically provided.
IV
To be clear, I do not suggest that Mayo was incorrectly decided on its particular facts. The claims at issue in Mayo contributed only routine application to a law of nature that was already well known. “At the time the discoveries embodied in the patents were made, scientists already understood that the levels in a patient’s blood of certain metabolites, including, in particular, [the individual metabolites measured in the claimed methods], were correlated with the likelihood that a particular dosage of a thiopurine drug could cause harm or prove ineffective.” 132 S.Ct. at 1295 (emphasis added). While “those in the field did not know the precise correlations between metabolite levels and likely harm or ineffectiveness,” id., “scien *1293 tists routinely measured metabolites as part of their investigations into the relationships between metabolite levels and efficacy and toxicity of thiopurine compounds,” id. at 1298 (emphasis added). In Mayo, the application of the natural law was merely routine optimization of drug dosage to maximize therapeutic effect.[6] As discussed above, Mayo thus forms part of a long line of Supreme Court decisions invalidating patent claims to conventional applications of well-known laws of nature.
V
Finally, it seems to me that the approach I suggest would not change the result in this case. Sequenom’s challenged claims embody a newly discovered natural phenomenon, the presence of paternally inherited cell-free fetal DNA (cffDNA) in a mother’s bloodstream. Judge Linn’s concurrence notes that “the amplification and detection of cffDNA had never before been done.” Arioso, 788 F.3d at 1381 (Linn, J., concurring). But the major defect is not that the claims lack inventive concept but rather that they are overbroad. See Mayo, 132 S.Ct. at 1294.
For example, claim 1 of the '540 patent broadly covers any method of detecting paternally inherited cffDNA from maternal serum or plasma via amplification and detection of that cffDNA. '540 patent, col. 23, 11. 61-67. Even the somewhat narrower claim 21 of the '540 patent, which recites a method of performing a prenatal diagnosis based on the presence, quantity, or sequence of paternally inherited cffDNA detected by the method of claim 1, still broadly encompasses any diagnosis of any disease, disorder, or condition. '540 patent, col. 26, 11. 4-14. Such claims appear to be impermissible attempts to capture the entire natural phenomenon of cffDNA rather than any particular applications thereof developed and actually reduced to practice by the inventors.
A future case is likely to present a patent claim where the inventive concept resides in a newly discovered law of nature or natural phenomenon, but the claim is narrowly drawn and actually reduced to practice. That case will, I hope, provide the Supreme Court with an opportunity to revisit the Mayo/Alice framework in this one limited aspect.

. See, e.g., Bilski v. Kappos, 561 U.S. 593, 611, 130 S.Ct. 3218 (2010) ("Hedging is a fundamental economic practice long prevalent in our system of commerce and taught in any introductory finance class.”) (quoting In re Bilski, 545 F.3d 943, 1013 (Fed.Cir.2008) (Rader, J., dissenting)) (emphasis added); Diamond v. Diehr, 450 U.S. 175, 177 n. 2, 101 S.Ct. 1048, 67 L.Ed.2d 155 (1981) (noting that the Arrhenius equation “has long been used to calculate the cure time in rubber-molding processes”) (emphasis added); Funk Bros. Seed Co. v. Kalo Inoculant Co., 333 U.S. 127, 129, 68 S.Ct. 440, 92 L.Ed. 588 (1948) ("Methods of selecting the strong strains [of nitrogen-fixing root-nodule bacteria] and of producing a bacterial culture from them have long been known.”) (emphasis added); see also the influential English patent case discussed in Mayo, 132 S.Ct. at 1300, Neilson v. Harford, Webster’s Patent Cases 295, 371 (1841) ("We think the case must be considered as if the principle [that hot air promotes ignition better than cold air is] well known ....”) (emphasis added).

. See, e.g., Intellectual Ventures I LLC v. Capital One Bank, 792 F.3d 1363, 1369 (Fed.Cir.2015) (invalidating claims that applied an abstract idea — tailoring of advertising to individual customers — which "had often been” used before); OIP Techs., Inc. v. Amazon.com, Inc., 788 F.3d 1359, 1362, 1364 (Fed.Cir.2015) (invalidating claims to computerized methods of offer-based price optimization and noting that the abstract idea implicated was a "fundamental economic concept[]”); Ultramercial, Inc. v. Hulu, LLC, 772 F.3d 709, 715 (Fed.Cir.2014) (invalidating a claim to routine, conventional application of the abstract idea of "using advertising as an exchange or currency” and rejecting the patentee’s argument that the idea was new); buySAFE, Inc. v. Google, Inc., 765 F.3d 1350, 1351, 1355 (Fed.Cir.2014) (invalidating a claim to a method of guaranteeing a party’s performance in an online transaction and finding that the abstract idea implicated was "beyond question of ancient lineage”); SmartGene, Inc. v. Advanced Biological Labs., SA, 555 Fed.Appx. 950 (Fed.Cir.2014) (invalidating a claim to computerized application of a mental process for treating medical patients that "doctors do routinely”).

. Any tension between Mayo and Myriad does not, of course, change our obligation to respect the sweeping precedent of Mayo, as the panel did. Supreme Court "decisions remain binding precedent until [the Court] see[s] fit to reconsider them, regardless of whether subsequent cases have raised doubts about their continuing vitality.” Hohn v. United States, 524 U.S. 236, 252-53, 118 S.Ct. 1969, 141 L.Ed.2d 242 (1998) (citation omitted).

. The "new applications” referred to by the Court must have meant applications of the newly discovered genes rather than inventive concepts at step two of the Mayo/Alice framework.

. It has been suggested that the requirements of enablement and written description will guard against the dangers of overclaiming a law of nature. Those doctrines, important as they are, generally require only that one or a handful of representative embodiments be described by the patentee. See, e.g., Donald S. Chisum, Chisum on Patents, § 7.03 at 7-15 (2015) ("An enabling disclosure is all that is required [for enablement]. The applicant need not describe actual embodiments or examples. Indeed, an applicant need not have reduced the invention to practice prior to filing.”); Id. § 7.04[l][e] at 7-309-7-310.1 ("In Ariad Pharmaceuticals, Inc. v. Eli Lilly & Co. (2010), the Federal Circuit, silting en banc, reaffirmed that written description of the invention is a requirement distinct from enablement.... [The court] declined to set forth 'bright-line rules,' including rules on the number of species needed to support a generic claim.”) (citing and quoting Ariad, 598 F.3d at 1351-52). Therefore, the doctrines of en-ablement and written description would not entirely prevent claims that preempt future applications of the law of nature by others.

. Cf. Pfizer, Inc. v. Apotex, Inc., 480 F.3d 1348, 1368 (Fed.Cir.2007) ("[Discovery of an optimum value of a variable in a known process is usually obvious.”); In re Geisler, 116 F.3d 1465, 1470 (Fed.Cir.1997) (noting that generally, in the context of obviousness, "it is not inventive to discover the optimum or workable ranges by routine experimentation”) (quoting In re Aller, 42 CCPA 824, 220 F.2d 454, 456 (1955)).